Alexander A. ARTWAY

v.

The **ATTORNEY GENERAL OF NEW JERSEY, The Superintendent of the New Jersey State Police, and The Chief of Police of Woodbridge Township, New Jersey.**

**Civ. A. No. 94–6287 (NHP).**

United States District Court,
D. New Jersey.

Feb. 28, 1995.

Order March 1, 1995.

Alexander A. Artway, pro se.

John J. Gibbons, Lawrence S. Lustberg, Jonathan Romberg, Christopher Walsh, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, court appointed atty. for plaintiff.

Glenn R. Paulsen, Capehart & Scatchard, P.A., Trenton, NJ, for New Jersey Senate.

Madeleine W. Mansier, Deputy Atty. Gen., Jane Grall, Asst. Atty. Gen., Larry R. Etzweiler, Deputy Atty. Gen., Deborah T. Poritz, Atty. Gen. of New Jersey, Trenton, NJ, for defendants Atty. Gen. of New Jersey, Superintendent of New Jersey State Police.

Frank W. Hunger, Asst. Atty. Gen., Arthur R. Goldberg, Henry A. Azar, Jr., U.S. Dept. of Justice, Washington, DC, George S. Leone, Frederick R. Kessler, Asst. U.S. Attys., Faith S. Hochberg, U.S. Atty., Newark, NJ, Geoffrey S. Berman, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for amici curiae.

Neal H. Flaster, Weiner Lesniak, Parsippany, NJ, for defendant Chief of Police of Tp. of Woodbridge.

POLITAN, District Judge.

This matter comes before the Court on plaintiff, Alexander A. Artway's motion for emergent, temporary and injunctive relief from enforcement of New Jersey's Sexual Offender Registration Act, commonly known as "Megan's Law". Defendants, the Attorney General of New Jersey and the Superintendent of the New Jersey State Police, in lieu of an answer and in opposition to plaintiff's motion, have moved for dismissal of plaintiff's Complaint on the ground that it contains no cognizable cause of action upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).

Plaintiff contends that Megan's Law, which mandates that he register with local and state authorities as a sexual offender and provides for the potential public dissemination of certain information regarding his identity, appearance, criminal record, and place of residence, is unconstitutional. Plaintiff argues that Megan's Law deprives him of his right to due process, equal protection and privacy, that it violates the constitutional prohibition against cruel and unusual punishment as well as the prohibition against *ex post facto* laws, and that it constitutes a bill of attainder. Defendants refute that challenge, and argue that the law is constitutional in both form and effect.

## FACTUAL CONTEXT

In 1971, a jury found plaintiff guilty of sodomy (N.J.S.A. 2A:143–1). In 1975 plaintiff was sentenced to imprisonment for a maximum term of twenty (20) years.[1] At his sentencing, the trial judge found that plaintiff's conduct was "characterized by a pattern repetitive, compulsive behavior." Plaintiff did not challenge that determination. He was imprisoned at the New Jersey State Prison Farm at Rahway, the Diagnostic Unit, which is now known as the Adult Diagnostic and Treatment Center ("ADTC").

Despite his case being reviewed several times by the Special Classification Review Board, plaintiff was never referred to the State Parole Board for parole consideration. In 1978, plaintiff was transferred to the Rahway State Prison because he was found to lack proper involvement and participation in the ADTC treatment program. On March 13, 1992, plaintiff was resentenced under the new code of criminal justice[2] and committed to the custody of the Commissioner of Corrections for a period of twenty (20) years with credit for time served. His resentencing was based on a redesignation of his original offense as sexual assault. Upon comple-

tion of his sentence, plaintiff was released from prison in 1992.

Megan's Law, enacted on October 31, 1994, was a legislative response to public outcry in New Jersey following the brutal murder of a young girl. Megan's Law was named after a seven-year-old child, Megan Kanka, who was raped and murdered, allegedly by a twice-convicted sex offender who lived across the street from Megan's home, unbeknownst to Megan or her parents. The public outcry which resulted from that child's plight led to the enactment of New Jersey's Sexual Offender Registration Act.

Under the terms of New Jersey's Sexual Offender Registration Act, a person who has completed a sentence for conviction on certain designated offenses is required to register if, at the time of sentencing, his[3] conduct was found to be "characterized by a pattern of repetitive and compulsive behavior". P.L. 1994 C. 133, § 2.b.(1). The individual must register with the chief law enforcement officer of the municipality in which he resides within one hundred and twenty (120) days of the effective date of the Act, or by February 28, 1995. P.L.1994 C. 133, § 2.c.(1). The registrant must give his name, Social Security number, age, race, sex, date of birth, height, weight, hair and eye color, address of legal residence, address of any current temporary residence, and date and place of employment. Id. at § 4.b.(1). He must verify his address every ninety (90) days, notify the municipal law enforcement agency when he moves, and re-register with the law enforcement agency of any new municipality to which he moves. *Id.* at § 2.d.–e., § 4.c.

After registration, the registering agency forwards the registrant's information, as well as any additional information it may have—such as fingerprints, genetic markers, a brief description of the criminal act of which the registrant was convicted, and any other information "necessary to assess the risk of re-

1. Between 1971 and 1975 plaintiff was a fugitive from justice. *Artway v. Pallone*, 672 F.2d 1168, 1170 n. 4 (3d. Cir.1982).

2. Title 2C, enacted pursuant to *Gerald v. Commission, New Jersey Department of Corrections*, 102 N.J. 435, 508 A.2d 1113 (1986) and *State v. Cruz*, 125 N.J. 550, 593 A.2d 1169 (1991).

3. While references in this Opinion to registrants use the masculine form of the third person singular, that is done purely for purposes of convenience. The Court is conscious that Megan's Law applies equally to males and females, and nothing in this Opinion is intended to suggest otherwise.

offense"—to the County Prosecutor of the county in which the registrant was prosecuted. *Id.* at § 4.c. The Prosecutor forwards the information to the Division of State Police for inclusion in a central registry and notifies the County Prosecutor of the county in which the registrant plans to reside. *Id.* at § 4.c.–d.

The information compiled as a result of registration is available for use by law enforcement agencies of New Jersey, the United States, and of other states. The registration information itself is not open to public inspection. However, law enforcement agencies are authorized to release "relevant and necessary information concerning registrants when ... necessary for public protection." *Id.* at § 4–6.

The Prosecutor of the county in which the registrant is expected to reside must consider the registration information and, in consultation with the Prosecutor of the county in which the registrant was convicted, make a determination as to whether the registrant poses a low, moderate, or high risk of re-offense. P.L.1994, c. 128, § 3.d.(1). In making that determination, the Prosecutor is required to consider a non-exclusive list of statutory factors, as well as factors included in the Attorney General's Guidelines promulgated pursuant to the Act. *Id.* at § 3.a.–b.

The three classifications concerning the likelihood of re-offense, labeled Tier 1, Tier 2, and Tier 3, respectively, each carry with them different notification provisions. When the risk of re-offense is low (Tier 1), the Prosecutor must notify law enforcement agencies likely to encounter the registrant. *Id.* at § 3.c.(1). When the risk is moderate (Tier 2), the Prosecutor, working with local law enforcement agencies, must notify schools, licensed day care centers and summer camps, as well as certain other designated agencies and community organizations involved in the care or supervision of children or the support of battered women and rape victims. *Id.* at § 3.c.(2). When the risk of re-offense is determined to be high (Tier 3), law enforcement agencies are required to notify members of the public likely to encounter the registrant. *Id.* at § 3.c.(3).

Under Tier 2 and Tier 3, the form of notification includes the registrant's name, a recent photograph, physical description, the offense, address, place of employment or schooling, as well as a description and the license plate number of the registrant's vehicle. *See* Attorney General's Guidelines for Law Enforcement for Notification to Local Officials and/or the Community of the Entry of a Sex Offender into the Community. Those agencies and persons notified under Tier 2 are informed that the information is intended to assist them in the protection of children, battered women or rape victims under their care, and that it is not to be shared with the general public. Every notification is accompanied by a warning as to the consequences of acts of vandalism, threats, and assaults against a registrant or any associates of the registrant, and a warning as to the criminal sanctions which would follow from such conduct. *Id.* at 13–14.

The defendants contend that Megan's Law constitutes little more than an extension of pre-existing New Jersey law allowing the public access to information concerning the criminal justice system in the State. Plaintiff, on the other hand, contends that the purpose and/or effect of Megan's Law is punitive, and constitutes a badge of ignominy.

Defendants argue that Megan's Law and its notification provisions are intended to be regulatory, and result from a legislative intent to assist law enforcement in identifying and alerting the public to the likely danger of re-offense by convicted sexual offenders. The Law was apparently enacted to address "the danger of recidivism caused by sex offenders, offenders who commit other predatory acts against children, and the dangers posed by persons who prey on others as a result of mental illness." P.L.1994, c. 133, § 1.a. As such, because Megan's Law is designed to protect the public and provide a public awareness whereby members of the community might be more vigilant in protecting themselves and their children, defendants contend that the Law is legitimate and that any encroachment on registrants' constitutional interests is purely incidental and nugatory.

Well-intentioned legislators, responding to public outcry, have sought to confront serious social issues—sexual crime and recidivism. These were, are and remain vital issues of concern to every member of our society. But, however well-intentioned, all laws must pass constitutional muster. The role of the judiciary is a difficult one. It does not involve policy-making, legislating, or otherwise reacting to public pressures. Rather, it requires an impartial review of those legislative actions based upon constitutional principles created by the Founders of this great nation.

### RIPENESS

■ The threshold matter which must be addressed by the Court is whether this matter is ripe for judicial determination.

Ripeness is a concern implicated by the doctrine of judiciability, deriving from the constitutional limitations placed upon Article III courts in recognition of the prudential considerations which sometimes mandate judicial restraint. *Flast v. Cohen*, 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). The ripeness doctrine itself, existing under the umbrella of judiciability, is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements" over matters which have not yet any practical impact on the parties. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967).

■ The issue of ripeness revolves around timing. When, as in the instant case, a constitutional challenge to a statute predates the actual enforcement of that statute against the challenger, the ripeness issue becomes particularly important. *See generally Regional Rail Reorganization Act cases*, 419 U.S. 102, 140, 95 S.Ct. 335, 357, 42 L.Ed.2d 320 (1974). When it is inevitable that enforcement of the statute against the challenger will occur, the court must look at the potential for hardship to either party by the court's refusal to hear the matter. *See* 10A C. Wright, A. Miller & M. Kane, *Federal*

*Practice and Procedure,* § 2757 (2d ed.1983). *See also Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974) ("[I]t is not necessary that [plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 664, 67 L.Ed. 1117 (1923) (plaintiff need not "await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough.").

In the instant case, while plaintiff has not yet suffered injury at the hands of Megan's Law, he is compelled to register prior to midnight on this date, February 28, 1995, or else face prosecution for a fourth-degree felony. In the Court's view, plaintiff's position is adequately perilous to satisfy the ripeness doctrine.[4]

A majority of states have already adopted legislation requiring that sex offenders register with local law enforcement agencies subsequent to their release from prison. Thirty-eight states have such provisions, although most do not provide for the general dissemination of the registrant's name, address, and/or criminal record to the general public. *See* Lisa Anderson, *Demand Grows to I.D. Molesters: States Weigh Children Safety Versus Offenders' Rights*, CHI.TRIB., Aug. 15, 1994, at 1. At least three (3) other states besides New Jersey have enacted legislation as expansive—in terms of the release to the public of information concerning sexual offenders now residing in the community—as is New Jersey's. *See, e.g.,* Alaska Stat. §§ 12.63.010, 18.65.087 (Supp.1994); La.Rev. Stat. an. at 15:543–549 (West 1994); 1990 Wash. Laws Ch. 3, at 101–1406 (codified in various sections of the Washington Revised Code). The manner in which these similar statutes have been reviewed and survived, or otherwise, constitutional scrutiny shall assist in guiding this Court in its determination of

---

4. The Attorney General further requests that this Court abstain because registration will not harm the plaintiff. However, plaintiff is facing a criminal penalty if he does not register under Megan's Law today. In addition, the Attorney General has stated at oral argument that if plaintiff fails to register, he will be criminally prosecuted. Under these circumstances, any argument for abstention obviously fails.

whether New Jersey's Megan's Law passes or fails constitutional muster.

While plaintiff has asserted several grounds for challenging the constitutionality of Megan's Law, the major avenues of attack which appear to have particular viability, and demand particular application in this case, are: (a) the *ex post facto* clause of the United States Constitution [5]; (b) the prohibition against cruel and unusual punishment as set forth in the Eighth Amendment [6]; (c) the constitutional right to privacy as recognized in the United States Constitution; the prohibition against Bills of Attainder; and (e) the Double Jeopardy Clause.[7] The Court shall focus on these challenges, *inter alia,* in determining the constitutionality of Megan's Law.

The Court's analysis suggests that the dispositive issue among the challenges raised is the *ex post facto* clause. However, due to the nature of the instant challenge and the wide-ranging implications of Megan's Law, the Court will consider all of the constitutional provisions asserted as they bear upon this Court's determination that Megan's Law in its retrospective application offends the constitutional protections enjoyed by plaintiff and all other would-be registrants.

## A. *The Ex Post Facto Clause*

Black's Law Dictionary defines an *ex post facto* law as "a law passed after the occurrence of a fact or commission of an act, which retrospectively changes the legal consequences or relations of such fact or deed." Black's Law Dictionary, 580 (West Sixth Ed.1990) (citations omitted.) The United States Constitution explicitly mandates that "no state shall pass any ... *ex post facto* law." U.S. CONST. Art. I, § 10.

Forty-six of the fifty United States have incorporated similar bans into their constitutions against the enactment of *ex post facto*

laws. See Neil C. McCabe and Sophia A. Bell, *Ex Post Facto Revisions of State Constitutions,* 4 Emergent Issues St. Const. L. 133, 133 n. 4 (1991) (noting that only Delaware, Hawaii, New York, and Vermont have no such constitutional provisions). New Jersey, like the majority of its sister states, has such a provision in its constitution. N.J. CONST. Art. IV, § 7, para. 3. Plaintiff in the instant case has asserted in his Complaint and in the various submissions to this Court on his behalf that Megan's Law violates the *ex post facto* clause of the United States Constitution.

The historical context and intent of the clause is instructive in determining its application in the instant case. The drafters of the United States Constitution placed a great deal of emphasis on the principle that, in this new Union recently released from the perceived tyranny of British rule, citizens should not be faced with the prospect that their conduct—innocent when carried out—could be rendered criminal after the fact. *See Calder v. Bull,* 3 U.S. (3 Dall.) 386, 389, 1 L.Ed. 648 (1798). Justice Chase, writing for the Court in *Calder,* wrote:

> The prohibition against the making of any *ex post facto* laws was introduced for greater caution, and very probably arose from the knowledge, that the Parliament of Great Britain claimed and exercised a power to pass such laws, under the denomination of bills of attainder, or bills of pains and penalties; the first inflicting capital, and the other less, punishment.... Sometimes they respected the crime, by declaring acts to be treason, which were not treason, when committed, [ ] at other times, they violated the rules of evidence (to supply a deficiency of legal proof) by admitting one witness, when the existing law required two; by receiving evidence without oath; or the oath of the wife

---

5. U.S. Const. Art. I, § 10.

6. U.S. Const. Amend. VIII.

7. Also relevant to the challenge of statutes such as Megan's Law are the Due Process and Equal Protection Clauses, deemed significant by the Assignment Judge of Burlington County, Judge Wells, A.J.S.C. *See Doe v. Poritz,* Civil Action No.

1–5–95 (Burlington County Law Div., February 28, 1995). However, in light of this Court's limited focus—namely, the retroactivity of Megan's Law and its dispositive effect on this case— the Court need not reach those concerns. Suffice it to say that the absence of a provision for objective judicial scrutiny in at the pre-classification stage is, at the very least, troubling.

against the husband; or other testimony, which the courts of justice would not admit; [ ] at other times they inflicted punishments, where the party was not, by law, liable to any punishment; [ ] and in other cases, they inflicted greater punishment, than the law annexed to the offense.... With very few exceptions, the advocates of such laws were stimulated by ambition, or personal resentment, and vindictive malice. To prevent such, and similar, acts of violence and injustice, I believe, the Federal and State Legislators, were prohibited from passing any bill of attainder; or any *ex post facto* law.

*Id.* (footnotes and citations omitted).

Justice Chase interpreted the *ex post facto* clause as a prohibition against state governments passing laws which have the effect of punishing citizens or subjects for conduct after the fact, where that conduct would not have been punishable when carried out. As such, Justice Chase considered the clause to be "an additional bulwark in favor of the personal security of the subject, to protect his person from punishment by legislative acts, having a retrospective operation." *Id.* at 390. Specifically, *Calder* held that the *ex post facto* clause encompassed:

> [a] Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. [b] Every law that aggravates a crime, or makes it greater than it was, when committed. [c] Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. [d] Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.

*Id.*

The *Calder* list of prohibited laws was expanded in *Kring v. Missouri,* 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883), and in *Thompson v. Utah,* 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898), to include instances wherein a citizen would be "disadvantaged" by the new law, or where it substantially deprived a citizen of his liberty. These expansions, however, were recently erased by the Supreme Court in *Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (overruling *Kring* and *Thompson*). The *Collins* court re-established the *Calder* criteria for determining the viability of laws under *ex post facto* scrutiny.

Under *Calder* analysis, the relevant scrutiny to which sex offender registration acts can be subjected, therefore, is whether the "law ... changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *See* 3 U.S. (3 Dall.) at 390. That analysis focuses on "whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation[.]" *DeVeau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 1155, 4 L.Ed.2d 1109 (1960). *See also Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981).

■ When the challenged legislation has a clear punitive purpose the court should apply *ex post facto* analysis, if appropriate. *DeVeau,* 363 U.S. at 160, 80 S.Ct. at 1155. If, on the other hand, the statute does not have a clear punitive purpose, the court must determine whether the effect of the statute or its scheme is punitive in nature—such that its application goes beyond its purely regulatory function. *United States v. Ward,* 448 U.S. 242, 248–49, 100 S.Ct. 2636, 2641–42, 65 L.Ed.2d 742 (1980). Indeed, even if the stated purpose of the legislation is a regulatory or procedural one, the court must still examine its effects to determine whether in fact the statute is punitive. *Collins,* 497 U.S. at 46, 110 S.Ct. at 2721 ("by simply labeling a law 'procedural,' a legislature does not thereby immunize it from scrutiny under the Ex Post Facto Clause.... Subtle *ex post facto* violations are no more permissible than overt ones."). *See also Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963) (when there is doubt as to whether the legislation was intended to be regulatory or punitive, the court must determine based on certain criteria the effect of the legislation).

■ In the instant case, this Court is faced with a challenge to a statute which is, on its face, retroactive in application. As such, the Court must engage in *ex post facto* analysis. That analysis begins with a determination of whether Megan's Law is regulatory or punitive. Despite the Legislature's stated aim that Megan's Law be regulatory and non-punitive, the Court must focus on the practical purpose and effect of the statute and reach an independent conclusion as to its true nature. Such an independent analysis is conducted in the manner prescribed by the Supreme Court in *Kennedy.*[8]

The non-exclusive list of factors to be applied in determining whether legislation is punitive as opposed to regulatory per *Kennedy* include:

Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [ ]. . . .

372 U.S. at 168–69, 83 S.Ct. at 567–68 (footnotes omitted).

Courts applying the *Kennedy* criteria to the registration statutes have reached differing conclusions. In the context of retroactively applicable registration statutes, the courts of two states have found that such statutes did not violate the *ex post facto* clause.

The Supreme Court of Arizona applied *ex post facto* analysis to a statute demanding that persons convicted of certain sexual offenses must register with the Sheriff of the county in which they reside or are temporarily domiciled within thirty (30) days of their release from prison or their entry into that county. *Arizona v. Noble,* 171 Ariz. 171, 829 P.2d 1217, 1219–20 & n. 1 (1992). The Arizona statute did not contain a provision under which the public would be informed of the ex-convicts' presence in the community. The court applied the *Calder* test relating to whether a changed or enhanced punishment had been attached to certain crimes or conduct after the fact. *Id.,* 829 P.2d at 1220.

As a threshold matter, the *Noble* court found that the statute did have a retroactive effect in that the registration requirement had not been in effect at the time the offend-

8. Both defendants and plaintiff's stand-by counsel argue that the *Kennedy v. Mendoza–Martinez* analysis is inappropriate in *ex post facto* review. Instead, they argue, the proper analysis is dictated by *Department of Revenue of Montana v. Kurth Ranch,* —— U.S. ——, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994); *Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993); and *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989). Plaintiff's stand-by counsel contends that the Attorney General is correct in arguing that these cases undermine and usurp *Kennedy* as the appropriate analysis in a case such as that presently before the Court. Quoting *Austin,* plaintiff's stand-by counsel would cast the appropriate analysis as: if the means employed by the government are not exclusively remedial or if they are even partially punitive, the entire statute or policy must be deemed punitive. *See* Plaintiff's Stand-by Counsel's brief at 27–29. While the Court realizes that in review of certain kinds of legislative provisions the appropriate test can vary, and that the Supreme Court has recently, in the cases cited by the parties, partially altered the appropriate form of analysis in certain contexts, none of the three cases relied upon by plaintiff's stand-by counsel serves in any way to either dilute or modify the appropriate use of *Kennedy* criteria in *ex post facto* contexts. *See, e.g., Kurth* (determining whether a civil penalty enforced in an action subsequent to and separate from a criminal proceeding violated the double jeopardy clause of the Fifth Amendment: reviewing *Halper* and confining that case's construction of punishment to the double jeopardy context); *Austin* (acknowledging the *Kennedy* analysis, although refusing to apply it in the narrow context of the Eighth Amendment's excessive fines clause); and *Halper* (confining its ruling to "rare case[s]," the Court held that a non-remedial civil sanction imposed subsequent to a criminal prosecution violates the double jeopardy clause; citing with approval one of the *Kennedy* criteria as "relevant to determination whether sanction is civil or criminal"—hardly an impeachment of those criteria as an appropriate analysis). Therefore, at least in the context of *ex post facto* review, it is appropriate to engage in *Kennedy* analysis to determine whether a statute is in fact punitive as opposed to regulatory. For a discussion of the appropriate test in a double jeopardy challenge, *see infra.*

ers challenging the statute had carried out their conduct; thus, they had not been given fair warning of the likely outcome of such conduct. As such, *ex post facto* analysis was triggered.

The Arizona Supreme Court then went on to consider whether the registration requirement constituted punishment. Applying the punitive versus regulatory analysis outlined above, the court concluded that the Arizona legislature had failed to categorize the statute as either punitive or regulatory. Therefore, the *Noble* court applied the factors set forth in *Kennedy* to determine the actual nature of the statute. *Id.*, 829 P.2d at 1221 ("These factors focus appropriate attention on the effects of the registration requirement on convicted sex offenders and on the rationality between the requirement and its purported non-punitive function.").

As to the first factor, whether the registration constituted an affirmative disability or restraint, the *Noble* court recognized that registration might impair a registrant's potential employability, leave him subject to increased police scrutiny, and would last for life. However, because the dissemination of the registrant's record (as provided for by the statute) was limited, and available only in certain sensitive areas of employment, the *Noble* court found that the statute did not fail under the first standard of *Kennedy* scrutiny.[9]

The second criterion set forth by *Kennedy* involves a determination as to whether the effects of the statute upon an individual would historically have been regarded as punishment. The *Noble* court found that "registration has traditionally been viewed as punitive." *Id.*, 829 P.2d at 1222. Acknowledging that other courts had viewed sex offender registration as an " 'ignominious badge' ", the Arizona Supreme Court recognized that the United States Supreme Court had previously found that keeping a criminal forever under the shadow of his own crime was oppressive and constituted a deprivation of essential liberty. *Id.*, 829 P.2d at 1223 (quoting *Weems v. United States*, 217 U.S.

349, 366, 30 S.Ct. 544, 548, 54 L.Ed. 793 (1910)). However, the *Noble* court felt that registration of sexual offenders did not constitute punishment in that "the provisions in the statute limiting access to the registration information significantly dampen its stigmatic effect." *Id.* (citations omitted).

As to the third element of the *Kennedy* scrutiny, namely whether the statute serves the traditional aims of punishment, the court found that the registration act had a deterrent effect and that sex offenders would be less likely to commit repeat acts when they knew that the police authorities had ready access to their whereabouts and records. *Id.* The court, likewise, found that the registration act served a legitimate law enforcement purpose not excessive in relation to its non-punitive aims. As such, the *Noble* court was satisfied that the fourth factor in the *Kennedy* analysis tipped the scales in favor of the statute. *Id.*, 829 P.2d at 1223–24.

In its conclusion, the *Noble* court found that a balance of the punitive and regulatory effects of the registration act led to the conclusion that the act did not offend the *ex post facto* clause. Noting that the decision was a close one, the court was persuaded that the registration act did not constitute punishment and that its retrospective application was not unconstitutional. This outcome appears to have rested, at least in part, on the *Noble* court's satisfaction that:

> Registrants are not forced to display a scarlet letter to the world; outside of a few regulatory exceptions, the information provided by sex offenders pursuant to the registration statute is kept confidential.

*Id.*

In *Washington v. Taylor*, 67 Wash.App. 350, 835 P.2d 245 (1992), the Washington Court of Appeals concluded that retroactive application of a sex offender registration act did not violate the *ex post facto* clause. *Taylor* was influenced by the *Noble* decision from Arizona. Noting the merit of *Noble*'s analysis, the Washington court acknowledged that the Arizona statute was more limited in

9. The court did recognize, however, that "employers and agencies already have access ... to the offender's conviction record, which includes

the fact of the conviction along with identifying information." *Id.*, 829 P.2d at 1222 (citations omitted).

terms of providing for the dissemination of information about registered offenders than was the Washington act. In fact, the latter placed very little limitation on the public dissemination of a registrant's record. *Id.,* 835 P.2d at 248–249.

The *Taylor* court was very much influenced by the fact that all of the information required by the statute was already part of the public record and could be unearthed by any person who chose to "make a reasonable effort to obtain it." *Id.,* 835 P.2d at 249. The court observed that the deterrent effect of the statute was hardly greater than the deterrent effect of a registrant's having already served a period of detention for his crime. "Any additional deterrent effect caused by the registration would be incidental and minimal. It falls far short of the effect needed to convert an intended regulation into additional punishment." *Id.* The *Taylor* court categorized the effect of the act in light of the preexisting societal taboo surrounding sexual offenses:

> There is a stigma attached to one who has committed a sexual offense. It stems from the fact of conviction and is not something that can be easily concealed once the offender has been released from custody. To the extent that registration makes it likely more persons will learn of the conviction, it is unlikely that the additional dissemination ·of the information brought about by registration will significantly increase the stigmatic effect over what it would be absent any registration requirement.

*Id.*

As such, the *Taylor* court found that the Washington Sex Offender's Registration Act was regulatory as opposed to punitive, and that it did not violate the *ex post facto* clause.

In 1994, the Supreme Court of Washington had cause to consider the issue of whether the retroactive application of the sex offender registration statute violated the *ex post facto* clause. In *Washington v. Ward,* 123 Wash.2d 488, 869 P.2d 1062 (1994), the Washington Supreme Court found that the statute did not constitute punishment and was thus constitutional under the *ex post facto* clause.

For the purposes of its determination, the *Ward* court presumed the statute to be substantive as opposed to procedural. Its analysis focused on whether the act altered the standard of punishment which had previously existed under Washington law for the crimes committed by the two sexual offenders who challenged the statute. . Going beyond the legislature's stated purpose that the act was intended to assist local law enforcement agencies, the court acknowledged that the *Kennedy* factors governed the determination of whether the statute had a. punitive effect.

The *Ward* court found that the registration requirements of the act did not amount to a badge of infamy; that a registrant's information was already part of the public record even without his registering; that the physical act of registration did not constitute an affirmative disability or restraint; and that the act did not inhibit registrants' free mobility within the state. *Id.,* 869 P.2d at 1069.

The *Ward* court went on to analyze whether the publicity, or its potential, associated with registration constituted punishment. The court noted that Washington law already had in it a provision whereby criminal justice agencies were permitted to release conviction records without restraint. As such, the court concluded that "the disclosure of conviction information cannot impose an additional burden." . *Id.* Moreover, the court was satisfied that only in cases where dissemination to the public of a registrant's information would be deemed "necessary for public protection" did the statute provide for public disclosure. Such a determination, namely to provide the information to the public, could only be made after an initial determination of the offender's likelihood to commit his crime again, his future dangerousness, and his potential threat to the community. Moreover, the court determined that

> disclosure must be "rationally related to the furtherance" of the goals of public safety and the effective operation of government.... Accordingly, the geographic scope of dissemination must rationally relate to the threat posed by the registered offender. Depending on the particular methods of an offender, an agency might decide to limit disclosure only to the sur-

rounding neighborhood, or to schools and day care centers, or, in cases of immediate or imminent risk of harm, the public at large. The scope of disclosure must relate to the scope of the danger. In addition, the content of a warning may vary by proximity: next door neighbors or nearby schools might receive a more detailed warning than those further away from harm.

*Id.*, 869 P.2d at 1070–71.

The Washington Supreme Court found no problem with the fact that the law enforcement agencies of the state had responsibility for deciding whether public dissemination of knowledge regarding individual registrants was appropriate or not.

While the Washington Supreme Court, dealing with a statute almost identical to Megan's Law, concluded that registration and notification requirements were constitutional, cases from two other jurisdictions have come to an opposite result. In *Louisiana v. Babin*, 637 So.2d 814 (Ct.App.La. 1994), a child molester challenged his conviction and sentence on several grounds. One of his challenges rested on a claim that a public notification condition of his probation (pursuant to a statute enacted after the commission of his crime) amounted to a branding, and would subject him to possible vigilante attacks following his release. *Id.* at 823–24. The particular conditions of probation challenged were:

3. The defendant shall give notice of the crime for which he was convicted, his name and address to:

(a) To people to [sic] who live within a one (1) mile radius where the defendant will reside upon release on probation;

(b) The superintendent of the school district where the defendant will reside, who shall notify the principal of whichever schools the superintendent thinks should be notified of the defendant's name, address and the crime for which he was convicted.

4. The defendant shall give notice of the crime for which he was convicted, his name, [and] his address by mail to all people residing within the designated area, within thirty (30) days of sentencing or within thirty (30) days of setting up residency in the locale where the defendant plans to have his domicile, and the notice shall be published on two separate days within this thirty (30) days [sic] period of time, without cost to the State, in the official journal of the governing authority of the parish where the defendant plans to reside.

*Id.* at 824.

The Louisiana Court of Appeals found that conditions (3) and (4) above violated the *ex post facto* clauses of the United States and Louisiana Constitutions. Because the provisions of the act under which the notification conditions were imposed upon Mr. Babin had not been in effect at the time he committed his crime, he could not be subject to such provisions. *Id.* The Louisiana Court did not engage in any analysis as to whether the conditions of probation—namely, the public disclosure provisions of Louisiana's notification law—were punitive as opposed to regulatory.

An unpublished decision from the District Court of Alaska, *Rowe v. Burton*, No. A. 94–206 (D.Alaska July 27, 1994), also reviewed the constitutionality of a statute almost identical to Megan's Law. In the context of a request for a preliminary injunction, the Court evaluated whether the statute violated the *ex post facto* clause of the United States Constitution.

The District Court of Alaska found that the Alaskan legislature had expressed an intent that the law provide for protection of the public. However, the Court found that "the Legislature's expressed purpose is not necessarily the measure of the Registration Act's character. The test is whether the questioned statute's design and effect evidence a purpose to regulate rather than to punish." *Id.* at 8 (citing, *inter alia, United States v. Ward*, 448 U.S. 242, 248–49, 100 S.Ct. 2636, 2641–42, 65 L.Ed.2d 742 (1980)). The Court rejected plaintiffs' contention that because the Alaska Registration Act was found in that section of the Alaska Code governing criminal procedure, that it was by definition a punitive law. Finding that the proper analysis should focus on "the substance of what

the Legislature has done[,]" the Court also rejected the argument that the Legislature's stated intent should govern. *Id.* at 9. Engaging in the punitive/regulatory analysis set forth by the Supreme Court in *Kennedy, supra,* the Alaska District Court determined that those criteria weighed in favor of finding the law punitive.

The initial determination, whether the law imposes an affirmative duty on registrants, led the *Rowe* court to conclude that "the Registration Act may subject registrants ... to public stigma and ostracism that would affect both their personal and professional lives." *Id.* at 11. The Court found that the second *Kennedy* criterion, whether the conditions imposed by the law were historically viewed as punishment, weighed in favor of finding against a punitive purpose. *Id.* at 12. Finding that the third element of the analysis, scienter, weighed in favor of finding the law punitive, the Court cautioned that the weight given this particular conclusion ought to be light based on Ninth Circuit precedent. *Id.* at 12–13 (citing *United States v. Huss,* 7 F.3d 1444 (9th Cir.1993)).

In its analysis whether the Registration Act promoted the traditional aims of punishment (namely, deterrence or retribution), the *Rowe* court found that the act was "obviously meant to deter crime." That finding notwithstanding, the court found that under the registration act the deterrence involved placed a *de minimis* burden upon registrants. "[T]he only meaningful deterrence flowing *directly* from registration comes from modifying the conduct of the police and the public. Forewarned of a sex offender's presence, potential victims may take evasive action, and the police may be able to act more swiftly." *Id.* at 13 (emphasis in original). The court's analysis, however, did not end there: it looked to the *indirect* consequence of registration. The *Rowe* court found that the embarrassment, harassment, ostracism, or worse, likely to result from public dissemination of a registrant's information deemed the act punitive. *Id.* at 14.

The fact that the conduct to which the Registration Act applied was already a crime, in the *Rowe* court's view, was indicative of the Act's punitive nature. As with scienter,

however, the court found that the weight given to this conclusion should be light. *Id.* at 15 (the *Rowe* court was again unwilling to trample on Ninth Circuit precedent by which it was bound). Finding that the Act was rationally related to the protection of society from crime, the court concluded that the sixth element of *Kennedy* analysis weighed against finding the registration act punitive.

The last element of *Kennedy* analysis gave the *Rowe* court reason to separate the registration requirement itself from the consequent public dissemination of a registrant's information. *Id.* at 15–16. The court looked to precedent from other jurisdictions (discussed herein), but independently concluded that Alaska's Registration Act was overly broad in its provision for the public dissemination of registration information. *Id.* at 16–17. As such, the court found that the seventh element of *Kennedy* analysis weighed in favor of finding the Act punitive.

Based on that balancing of the punitive versus regulatory criteria, the court was persuaded that plaintiffs had a meritorious claim that the Alaska Registration Act violated the *ex post facto* clause of the Constitution. *Id.* at 17.

In the instant case, if the Court is to find that the legislative purpose for Megan's Law was not entirely or solely regulatory, it must apply the *Kennedy* factors thereto and determine its actual punitive aims or effects, if any. In so doing, the *Kennedy* factors cannot be viewed in a vacuum. Instead, they must—in practical application—take cognizance of other related criteria such as the purposes of punishment generally, the privacy interests involved, and the concerns implicated by the other challenges asserted by plaintiff.

Before proceeding with an analysis of Megan's Law in the *ex post facto* context, it is helpful to review the other claims of unconstitutionality involved in this case, particularly since in the *ex post facto* analysis, there are overlapping constitutional considerations.

**(B) CRUEL AND UNUSUAL PUNISHMENT**

The Eighth Amendment to the United States Constitution prohibits the infliction of

cruel and unusual punishment. U.S. CONST. Amend. VIII. The original intent of the Eighth Amendment was to protect United States citizens from torture and barbarous treatment. *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). The concept has been expanded over time. *See Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910) (punishment should be proportionate to the crime); *Trop v. Dulles*, 356 U.S. 86, 99, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958) (punishment should fall within the confines of civilized standards); *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962) (applying the Eighth Amendment to the states under the Fourteenth Amendment).

There is some disagreement as to the appropriate test courts should apply in Eighth Amendment cruel and unusual punishment analysis. However, in the instant context, the Court must first focus on whether the registration act passed by the New Jersey Legislature may be categorized as "punishment". If the Court so finds, it must then determine whether the registration act and its attendant notification provisions constitute "cruel and unusual" punishment. *See Kennedy v. Mendoza–Martinez, supra.*

It is well established that, in the context of Eighth Amendment statutory review, the Court should focus on whether the penalty involved accords with "the dignity of man," and whether the punishment is "grossly disproportionate" to the offense involved. *McCleskey v. Kemp*, 481 U.S. 279, 300, 107 S.Ct. 1756, 1771, 95 L.Ed.2d 262 (1987); *Trop v. Dulles*, 356 U.S. 86, 100, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958). In 1983, the Supreme Court set forth a three-prong test to be used in evaluating whether or not punishment is proportionate to the ·crime. In *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the Court established that a determination must be made of (1) "the gravity of the offense and the harshness of the penalty", (2) "the sentences imposed on other criminals in the same jurisdiction", and (3) "the sentences imposed for commission of the same crime in other jurisdictions." *Id.* at 291–92, 103 S.Ct. at 3010–11. *See*

*Solem.* The *Solem* test, however, appears to have lost favor with the Supreme Court.

In *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the Court was divided in its lack of continued support for the *Solem* criteria. One plurality of the Court concluded that "*Solem* was simply wrong; the Eighth Amendment contains no proportionality guaranty." *Id.* at 965, 111 S.Ct. at 2686 (opinion of Scalia, J., joined by Rehnquist, C.J.). On the other hand, another plurality agreed that "the Eighth Amendment does not require strict proportionality between crime and sentence ... [but] forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 1001, 111 S.Ct. at 2705 (opinion of Kennedy, J., joined by O'Connor and Souter, JJ.). Thus, what is clear from *Harmelin* is that clarity is now lacking as to the proper application of Eighth Amendment scrutiny to legislation such as that presently before this Court.

Because Megan's Law has been challenged on the ground that it violates the cruel and unusual punishment prohibition of the Eighth Amendment, the Court must attempt to determine—under *some* appropriate standards—whether Megan's Law does in fact violate plaintiff's constitutional rights. In this effort, the Court is guided by decisions from other jurisdictions evaluating the effect of the Eighth Amendment on registration acts.

■ As previously noted in the discussion of the *ex post facto* challenge, the courts of other jurisdictions have differed as to whether notification statutes constitute punishment. Moreover, as noted in the discussion of *Collins, supra*, merely being labeled by the legislature as a regulatory rather than a punitive provision does not save legislation from *Kennedy* scrutiny. It should be further noted that, in the context of statutes requiring registration only with local authorities and containing no public notification provisions, courts upholding such laws have been persuaded by the fact that the laws before them did not mandate public dissemination of registrants' registration information. At least one court rested on that criterion in determining that the statute under review was not punitive. *See People v. Adams*, 198

Ill.App.3d 74, 144 Ill.Dec. 402, 407, 555 N.E.2d 761, 766 (1990), aff'd, 144 Ill.2d 381, 163 Ill.Dec. 483, 581 N.E.2d 637 (1991).

In the pre-*Harmelin* case of *Arizona v. Lammie,* 164 Ariz. 377, 793 P.2d 134 (Ct.App. 1990), the Arizona Court of Appeals concluded that that state's registration act did not violate the cruel and unusual punishment prohibition of the Eighth Amendment. Basing its analysis on *Solem,* the court concluded that the gravity of the offense (attempted sexual assault with violence) justified the harshness of the penalty. Registration, in the *Lammie* court's view, had a "prophylactic effect, deterring [the registrant] from future sexual crimes." *Id.,* 793 P.2d at 139. Because all other sexual offenders within the jurisdiction also had to register under the act, the court found that the statute survived the second element of *Solem* analysis. Likewise, because other states imposed similar penalties for the same crime, the court was satisfied that Arizona's registration act was not disproportionate to that of other jurisdictions. *Id.,* 793 P.2d at 140.

A case from the Supreme Court of Illinois, *People v. Adams,* 144 Ill.2d 381, 163 Ill.Dec. 483, 581 N.E.2d 637 (1991), began and ended its Eighth Amendment analysis with a determination that the statute was non-penal in nature. *Id.,* 163 Ill.Dec. at 487–88, 581 N.E.2d at 641–42. Concluding that the Illinois Legislature had intended the act to be non-penal, the court determined that no application of *Kennedy* principles to determine whether the act was non-regulatory was necessary. *Id.,* 163 Ill.Dec. at 487, 581 N.E.2d at 641. Moreover, the court was persuaded, at least in part, by the fact that the act made no attempt "to correct the behavior of sex offenders." *Id.*

The *Adams* court, in *dicta,* considered the registrant's argument that the effect of the statute was to confer upon him a public stigma, thereby constituting cruel and unusual punishment. The court was unpersuaded by that argument in light of the fact that Illinois' registration act did not provide for public dissemination of a registrant's information—in fact, it outlawed such dissemination. *Id.,* 163 Ill.Dec. at 487, 581 P.2d at 641. *See also Ohio v. Douglas,* 66 Ohio App.3d

788, 586 N.E.2d 1096 (1989) (a pre-*Harmelin* case applying *Solem* analysis, holding that non-public registration statute was constitutional); *Washington v. Estavillo,* 69 Wash. App. 401, 848 P.2d 1335 (1993) (finding that a registration statute was not punitive, thus a cruel and unusual punishment analysis was not triggered).

As such, it appears from the *Trop* and *Solem* line of cases—culminating in *Harmelin*—that courts applying Eighth Amendment cruel and unusual punishment analysis react only to severe harshness bearing no relation to the gravity of the underlying offense. Although the consequent application of *Kennedy*'s punitive versus regulatory analysis may thus be considered only a threshold concern, its application is still required to make that preliminary determination. In this respect, both *ex post facto* analysis and Eighth Amendment analysis hinge on the same initial determination.

This Court need not address the second concern under the Eighth Amendment: whether the punishment inflicted is cruel and unusual. Such a determination—in light of plaintiff's challenge to the retroactive application of Megan's law—would in practical terms be redundant because of the application of the *ex post facto* doctrine. Thus, while this Court does not reach the issue of whether or not the registration and notification provisions of Megan's Law violate the Eighth Amendment, it is mindful of the concerns expressed by both the Supreme Court and other courts. Therefore, this Court will consider them in the overall evaluation of the *ex post facto* challenge and the application of the *Kennedy* analysis.

## (C) THE RIGHT TO PRIVACY

The framers of the Constitution, although expressing concern for the protection of life, liberty, and property, did not install in the Constitution any provision protecting the privacy interests of United States citizens. However, the Supreme Court has, in a series of observations and *dicta* culminating in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), recognized an individu-

al's right to hold certain private matters secure, away from public scrutiny.[10]

The modern genesis of the right to privacy may be found in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). In *Griswold*, the Supreme Court recognized that there are certain zones of privacy upon which the government cannot tread. The *Griswold* Court found a Connecticut statute restricting the use of contraceptives by married couples to be unconstitutional on the ground that it impinged on matters "concerning a relationship lying within the zone of privacy created by several fundamental constitutional guarantees." *Id.* at 485, 85 S.Ct. at 1682. The court found these constitutional guarantees in the First, Third, Fourth, Fifth, and Ninth Amendments. *Id.* at 484, 85 S.Ct. at 1681. In *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), the Court extended the right to privacy to include the right of unmarried persons to gain access to contraceptive devices. *Id.* at 452–55, 92 S.Ct. at 1037–39. The privacy doctrine reached its analytical zenith in the 1973 case of *Roe*.

In *Roe*, the majority traced the development of the right to privacy. 410 U.S. at 152–53, 93 S.Ct. at 726–27. The Court balanced a woman's right to either abort a fetus or carry it to term against the state's interest in regulating that choice. Determining that the state does have some right to regulate abortion at certain stages in the pregnancy, the Court, however, concluded that a woman's right to privacy protects the decision whether to abort a fetus. *Id.* at 153–54, 93 S.Ct. at 727–28. *Roe* listed those areas of personal autonomy which deserve protection under the constitutional right to privacy: activities relating to marriage, procreation, contraception, family relationships, child rearing, and education. *Id.* at 152–53, 93 S.Ct. at 726–27 (citations omitted). Thus, coupled with the right of a woman to continue or terminate her pregnancy, after *Roe* this list constituted the gamut of privacy protections.

In 1977 the Supreme Court acknowledged that the right to privacy may include "the individual interest in avoiding disclosure of personal matters[.]" *Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 877, 51 L.Ed.2d 64 (1977). *Whalen* involved a New York State policy of maintaining computer files to record the names and addresses of persons who had obtained certain controlled prescription drugs. That policy was challenged on the ground that it infringed such persons' right of privacy. While recognizing the privacy right to safeguard personal information, in *Whalen* the Court found that such a right had not been violated by the New York policy. *Id.* at 603–04, 97 S.Ct. at 878–79. Later, in *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Court revisited the concept of informational privacy. In a challenge to a congressional act allowing the government to obtain former President Nixon's presidential papers which related to the Watergate era, the Court found that in that instance the public interest in obtaining the documents coupled with the proper screening of the material so as not to offend Mr. Nixon's privacy concerns deemed the act constitutional. *Id.* at 465, 97 S.Ct. at 2801. Thus, the Court *balanced* privacy interests against the public need for information.

In a 1976 case, the Supreme Court considered whether an individual's interest in his reputation was protectable under the right to privacy. In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Court reviewed the distribution by police of a photograph and informational sheet designating an individual as an active shoplifter, even though he had merely been arrested for shoplifting and had not yet been convicted thereof. Reviewing the individual's privacy claim, the Court stated:

10. "It is our purpose to consider whether the existing law affords a principle which can properly be invoked to protect the privacy of the individual; and, if it does, what the nature and extent of such protection is." Samuel D. Warren and Louis D. Brandeis, *The Right to Privacy*, 4 Harv.L.Rev. 193, 197 (1890) (suggesting that an individual has the "right to be let alone"). *See Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), *overruled by Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

[Challenger] claims constitutional protection against the disclosure of the fact of his arrest on a shoplifting charge. His claim is based, not upon any challenge to the state's ability to restrict his freedom of action in a sphere contended to be "private," but instead on a claim that the state may not publicize a record of an official act such as an arrest. None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner.

*Id.* at 713, 96 S.Ct. at 1166.

On the other hand, in 1989, the Supreme Court—interpreting the boundaries of the Freedom of Information Act—considered a denial by the Federal Bureau of Investigation ("FBI") of a request for the criminal identification records or 'rap sheets' of one Charles Medico. In *United States Department of Justice v. Reporters Committee*, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), the Court opined:

To begin with, both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person. In an organized society, there are few facts that are not at one time or another divulged to another. [ ] Thus the extent of the protection accorded a privacy right at common law rested in part on the degree of dissemination of the alleged private fact and *the extent to which the passage of time rendered it private. [ ]* According to Webster's initial definition, information may be classified as "private" if it is "intended for or restricted to the use of a particular person or group or class of persons: not freely available to the public." [ ] Recognition of this attribute of a privacy interest supports the distinction, in terms of personal privacy, between scattered disclosure of the bits of information contained in a rap sheet and revelation of the rap sheet as a whole. The very fact that federal funds have been spent to prepare, index, and maintain these criminal-history files demonstrates that the individual items of information in the summaries would not otherwise be "freely available" either to the officials who have access to the underlying files or to the general public. Indeed, if the summaries were "freely available," there would be no reason to invoke the FOIA to obtain access to the information they contain.... *Plainly, there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country, and a computerized summary located in a single clearing house of information.*

*Id.* at 763–64, 109 S.Ct. at 1476–77 (citations omitted) (emphasis supplied).

Although *Reporters Committee* focused mostly on Exemption 7(c) to the FOIA, 5 U.S.C. § 552(b)(7)(C), the Supreme Court's concern with the right to privacy of an individual's rap sheet, although available for compilation from various and sundry other sources, is a factor which this Court must consider in the instant determination. While arguably not expanding the right to privacy, *Reporters Committee* essentially summarized, albeit in another context, the notification authorized by Megan's Law.

Perhaps the most succinct illustration of protectable privacy concerns under the Constitution comes from *Whalen v. Roe*, 429 U.S. 589, 598–99, 97 S.Ct. 869, 876–77, 51 L.Ed.2d 64 (1977): "The cases sometimes characterized as protecting 'privacy', have in fact involved at least two different kinds of interests. [ ] One is the individual interest in avoiding disclosure of personal matters, [ ] and another is the interest in independence in making certain kinds of important decisions." *Id.*

The Third Circuit has recognized that differences of opinion exist as to whether intermediate or strict scrutiny should be applied to legislation challenged on the grounds that it violates an individual's right to privacy. In *Fraternal Order of Police, Lodge 5 v. Philadelphia*, 812 F.2d 105, 110–11 (3d Cir.1987), the court rearticulated and applied a balancing test it had previously adopted in the context of requests for information:

"[W]e must engage in the delicate task of weighing competing interests. The factors which should be considered in deciding whether an intrusion into an individual's privacy is justified are the type of record

requested, the information it does or might contain, the potential for harm in any subsequent nonconsentual [sic] disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access."

*Id.* at 110 (quoting *United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 578 (3d Cir.1980)).

Although *Fraternal Order of Police* focused on the right of a police department to ask specific questions of candidates for its special investigations unit—with the promise that such information would remain confidential and be reviewed only by a limited number of necessarily authorized individuals—the case is instructive in that it grouped privacy interests into three categories. The first and second categories, medical information and personal financial information, respectively, are inapplicable in the instant matter. The third category, behavior information, related to the habitual or recreational activity of the candidates. Two of the questions asked of the candidates concerned whether they consumed alcoholic beverages or whether they gambled. The Third Circuit recognized that both of these activities, when carried out in public, involved no privacy interest. "On the other hand, the questions also encompass private drinking habits and more secretive gambling, such as in a small group game. When the information is inherently private, it is entitled to protection." *Id.* at 116.

The defendants and *amici* contend that no information in a registrant's registration package falls outside this third category recognized by the Third Circuit: namely, behavior information. The defenders of Megan's Law argue that all the information concerning a registrant's criminal history is already part of the public domain, and merits no privacy protection. In regard to his place of dwelling, place of employment, description and identity of his vehicle, they suggest that all of these are intrinsically public matters. Because a registrant must leave his home

and be visible, because he is visible to his co-workers in his place of employment, and because his vehicle, if any, is *de facto* visible, the defenders of Megan's Law suggest that no privacy interest relates to these matters under the principles of *Fraternal Order of Police.*

The Third Circuit, however, made a distinction between that information about which the police department could inquire, and that information which it would be at liberty to disclose to the public. *Id.* at 118. Under the inquiry procedures of the governmental body in *Fraternal Order of Police,* the information at issue was to be disclosed only to those who had "a particular need for it [.]" *Id.* The information was to be destroyed or returned to the candidate after it had been reviewed. The court was concerned, however, that the police department had inadequate provisions for enforcement of such limited review, and the fact that there were no provisions for penalizing those who, either purposely or inadvertently, revealed the questionnaire information. *Id.*

It appears, therefore, that while *Fraternal Order of Police* stands for the proposition that certain behavioral aspects of everyday life must deem particular personal matters public, it is not as expansive a justification for Megan's Law as the defenders would allege. It is unquestionable that a registrant's criminal history is part of the public record. Moreover, unless a registrant is reclusive, his place of dwelling or employment must, at some stage, become known to some members of the community. However, the Court finds no blanket justification for the notification provisions of Megan's Law simply by reference to the Third Circuit's opinion in *Fraternal Order of Police.*

As this overview of the development and scope of the right to privacy illustrates, there are certain personal matters innate to every individual into which the government cannot pry. The cases interpreting and delineating the constitutional right to privacy provide no clear answer to the effect of that liberty on the instant determination. Indeed, it appears from the relevant precedent that if plaintiff's challenge rested on privacy concerns alone, it would founder on the rocks

created by the modern constitutional ebb resultant from the Supreme Court's retreat from the expansions of *Roe*. However, given the nature of Megan's Law and the fact that matters personal are inextricably intertwined with the notification provisions thereof, the Court must evaluate and consider plaintiff's privacy interest in personal information in the overall determination of this case.

As with the Eighth Amendment concerns relevant to the ultimate determination of this case in the context of *ex post facto* analysis, where recognized privacy concerns are relevant to *Kennedy* analysis, they shall be considered.

### (D) *BILLS OF ATTAINDER*

Plaintiff claims that Megan's Law violates the constitutional prohibition against bills of attainder: "No bill of attainder ... shall be passed." U.S. CONST. Art. I, at 9, Cl. 3.

An attainder was a feature of ancient British common law abominable to the Framers of the Constitution. It was a device or legal consequence attendant to a sentence of death, marking the sentenced individual as an "attaint, attinctus, [or] stained." 4 William Blackstone, Commentaries 373. An attainder was not just a mark of infamy, however, it was a sword with double-edged legal consequence: the attaint forfeited all his real and personal property to the Crown, and also lost his right to transmit his property by devise or otherwise, as well as losing any right of inheritance he may have had. *Id.* at 381.

An attainder is distinguishable from a "bill of attainder," which was originally a mechanism whereby the English Parliament could, by legislative fiat, escheat the property of dead subjects—specifically traitors—to the

Crown. The first of these bills was enacted in around the year 1300. *See* Michael P. Lehman, *The Bill of Attainder Doctrine: A Survey of the Decisional Law,* 5 Hastings Const. L.Q. 767, 772 (1978). Subsequently, bills of attainder were used by the English Parliament as a device to punish individuals for activities against the interests of the Crown. Comment, *The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause,* 72 Yale L.J. 330, 331 (1962).[11]

The Framers of the Constitution feared a continuation by the government of the use of bills of attainder when expedient to sate popular public passions. In explaining both the *ex post facto* and bill of attainder clauses, Chief Justice Marshall wrote that the Framers "viewed with some apprehension the violent acts which might grow out of the feelings of the moment" and that, as a precautionary measure, "the people of the United States ... have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed." *See Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 322, 18 L.Ed. 356 (1867) (quoting *Fletcher v. Peck,* 10 U.S. (6 Cranch), 3 L.Ed. 162 (1810)). Alexander Hamilton justified the two clauses as exhibiting the "concern that legislatures might cater to the 'momentary passions' of a 'free people, in times of heat and violence....'" *Nixon v. Administrator of General Services,* 433 U.S. 425, 480, 97 S.Ct. 2777, 2809, 53 L.Ed.2d 867 (1977) (quoting *United States v. Brown,* 381 U.S. 437, 444, 85 S.Ct. 1707, 1712, 14 L.Ed.2d 484 (1965)). The *Nixon* Court stated that "a major concern that prompted the bill of attainder prohibition [was] the fear that the legislature, in

---

11. This history of the bill of attainder was set forth in a 1993 case from the Court of Appeals for the Second Circuit, *In re McMullen,* 989 F.2d 603, 604–606 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 301, 126 L.Ed.2d 249 (1993) (noting that Thomas Jefferson had been involved in the passage of a bill of attainder in the Commonwealth of Virginia in 1778). *McMullen* reversed a District Court finding that the supplementary extradition treaty between the United States and the United Kingdom constituted a bill of attainder as applied in the case of Mr. McMullen. The Second Circuit catalogued the develop-

ment of the prohibition against bills of attainder in the United States. For instance, the Court cited *United States v. Lovett,* 328 U.S. 303, 315, 66 S.Ct. 1073, 1078, 90 L.Ed. 1252 (1946) (holding that the doctrine prohibits any act "no matter what [its] form, that applies either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment upon them without a judicial trial."); *United States v. Brown,* 381 U.S. 437, 447–48, 85 S.Ct. 1707, 1714–15, 14 L.Ed.2d 484 (1965) (recognizing that the bill of attainder prohibits punitive legislation).

seeking to pander to the inflamed popular constituency, will find it expedient openly to assume the mantle of judge—or, worse still, lynch mob." 433 U.S. at 480, 97 S.Ct. at 2809.

In determining whether a statute is punitive within the context of the bill of attainder doctrine, three tests are relevant: (1) the historical test concerns whether the "punishment [was] traditionally judged to be prohibited by the bill of attainder clause[;]"[12] (2) the functional test which "analyz[es] whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further non-punitive legislative purposes[;]", and (3) the motivational test, which examines whether the legislature intended the statute in question to be punitive. *McMullen*, 989 F.2d at 607 (citing and quoting *Nixon v. Administrator of General Services*, 433 U.S. at 475–78, 97 S.Ct. at 2806–08).

In the instant case, the Court must focus on the second of these tests. The first test, hinging on matters traditionally prohibited by the doctrine, is inapplicable in that the category of punitive measures traditionally banned by the doctrine does not include any of the effects, actual or potential, of Megan's Law. The third test, whether the legislature intended the act to be punitive, has been sufficiently addressed in this Court's discussion of plaintiff's *ex post facto* and Eighth Amendment challenges. Therefore, the Court must consider whether Megan's Law and its inherent burdens, if any, can reasonably be said to further non-punitive legislative purposes.

While Megan's Law does not name any specific individual or a group of individuals, it applies by definition to a limited and identifiable segment of society: namely, sex offenders who meet the registration criteria. On the face of the statute, its aim appears to further the interests of law enforcement and societal protection. Its effect, admittedly, may potentially be detrimental to a specific group in society: namely, registrants. How-

ever, the Supreme Court has found that some detrimental effect is tolerable as long as the limited scope of a law is connected to and explained by the problem the legislature seeks to address. *See Nixon*, 433 U.S. at 469–72, 97 S.Ct. at 2803–05.

Megan's Law was enacted in response to the public outcry following the brutal murder of Megan Kanka and as an effort to address the high level of recidivism believed by the legislature to exist among sex offenders. Its apparent purpose was to reduce the likelihood of recidivism by informed policing, heightened public awareness, and vigilance.

The fact that Megan's Law focuses on a *specific* public concern is not fatal under the bill of attainder doctrine, because its scope is not exclusively limited to one identifiable group. Megan's Law provides for the dissemination of information to the public about "any person who poses a danger under circumstances that are not provided for" therein. *See* P.L.1994, c. 128, § 5. The defendants suggest that this provision in the act deems Megan's Law a law of general applicability, thereby falling outside the prohibition against bills of attainder. Citing *Matter of Coruzzi*, 95 N.J. 557, 472 A.2d 546, *appeal dismissed*, 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 8 (1984), the defendants contend that the doctrine does not prohibit the enactment of laws in response to a particular community or legislative concern: "A law of general applicability is not unconstitutional merely because its enactment was inspired by a specific example of the evil which it seeks to suppress." *Id.* at 580.

Although Megan's Law was enacted in response to public disgust arising from a series of brutal crimes by released sex offenders, such a fact alone is not fatal to the act's survival. Indeed, based on the foregoing review of this doctrine, the Bill of Attainder Clause and its counterbalances, standing alone, do not invalidate Megan's Law. In the *ex post facto* analysis of this case, however, certain concerns deriving from the bill of attainder doctrine are relevant to plaintiff's case and shall be considered.

---

12. This category would include death, imprisonment, banishment, punitive confiscation of property by the sovereign, and laws impinging upon the right of groups or individuals from engaging in certain employment or vocations. *Id.*

## (E) *DOUBLE JEOPARDY*

The Double Jeopardy Clause prohibits governments from punishing citizens a second time for the same offense for which they had previously been punished. "The double jeopardy clause ... 'prohibits merely punishing twice, or attempting a second time to punish criminally, for the same offense.'" *United States v. Halper*, 490 U.S. 435, 442, 109 S.Ct. 1892, 1898, 104 L.Ed.2d 487 (1989) (citation omitted). *Halper* involved a challenge to a civil sanction imposed subsequent to a criminal prosecution on the grounds that it violated the double jeopardy clause. The Supreme Court found that violations of the clause "can be identified only by assessing the character of the actual sanctions imposed on the individual by the machinery of the state." *Id.* at 447, 109 S.Ct. at 1901.

The *Halper* Court acknowledged that civil sanctions may often be aimed at both punitive and remedial goals, and likewise that criminal sanctions may have remedial as well as punitive purposes. "The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law, and for the purposes of assessing whether a given sanction constitutes multiple punishment barred by the double jeopardy clause, we must follow the notion where it leads." *Id.* at 447–448, 109 S.Ct. at 1901–02. In that context, the Court acknowledged that where a civil penalty "serves the goals of punishment[,]" that civil penalty acquires a punitive identity. *Id.* at 448, 109 S.Ct. at 1901. However, the *Halper* decision stated the "rule for the rare case" where "the subsequent proceeding bears no rational relation to the [government's] goal[.]" *Id.* at 449, 109 S.Ct. at 1902. *See also Department of Revenue of Montana v. Kurth Ranch*, —— U.S. ——, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) (assessing whether a drug tax law imposed subsequent to criminal prosecution constituted a penalty under the double jeopardy doctrine); *Austin v. United States*, —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (applying double jeopardy clause analysis in the limited context of the Eighth Amendment excessive fines clause).

Because the *ex post facto* clause is dispositive in the instant case, the Court need not reach a conclusion as to Megan's Law's viability under the double jeopardy clause. However, as with the other constitutional issues asserted by plaintiff, the Court shall take cognizance of those concerns implicated by the double jeopardy clause which are relevant to the instant *ex post facto* determination.

## *MEGAN'S LAW*

### *Presumption of Constitutionality*

■ The defenders of Megan's Law argue that this legislative enactment is entitled to presumption of constitutional validity. *See New York State Club Association v. City of New York*, 487 U.S. 1, 17, 108 S.Ct. 2225, 2236, 101 L.Ed.2d 1 (1988); *DeBartolo Corp. v. Florida Gulf Coast Building and Construction*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988). The burden is thus on the plaintiff to establish the unconstitutionality of Megan's Law. *See New York State Club Association*, 487 U.S. at 17, 108 S.Ct. at 2236; *Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 950, 59 L.Ed.2d 171 (1979). Defendants and the *amici curiae* have cited to the Third Circuit case of *Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164, 1171 (3d Cir.1986) (*en banc*), in support of the proposition that only the legislature may make decisions as to the appropriate dissemination of information for the public good.

■ While the Court recognizes the broad powers of the legislature in protecting the health, safety, and welfare of citizens, it must not lose sight of its judicial function even in the face of public outcry. It is this Court's function and responsibility to protect the constitutional rights of the minority or the individual. That role and task becomes most immediate and onerous in situations where legislatures encroach individual constitutional rights in the name of the common good. Plaintiff contends that Megan's Law presents such a crisis.

In regard to the *ex post facto* nature of the instant legislation, *amici* refer the Court to the language in *DeVeau*, wherein the Supreme Court cautioned against knee-jerk reaction to the possible unpleasant consequences of legislation which was intended by

the legislature to be regulatory.[13] The Court finds DeVeau to be inapposite.

DeVeau involved a legislative attempt by use of licensing procedures to rid corruption on the New York Waterfront. One aspect of that effort was to prohibit ex-felons from holding office in the Waterfront Union, and to prevent convicts of certain crimes from holding employment on the Waterfront. Id., 363 U.S. at 153–54, 80 S.Ct. at 1151–52. The Supreme Court equated this legislative action to other instances in which convicted felons have been barred from certain jobs "to insure against corruption in specified, vital areas." Id. at 158–59, 80 S.Ct. at 1153–55. The Supreme Court concluded: "The proof is overwhelming that New York sought not to punish ex-felons, but to devise what was felt to be a much needed scheme of regulation of the waterfront, and for the effectuation of that scheme it became important whether individuals had previously been convicted of a felony." Id. at 160, 80 S.Ct. at 1155.

■ DeVeau is clearly distinguishable from the instant case in that the New York legislation sought not to place a public badge of ignominy upon ex-convicts, but instead was an attempt to regulate a specific and vital sphere of employment and commerce. To the extent that any cloud hanging over an ex-convict's future resulted from his own conduct and not the challenged legislation, DeVeau again is distinguishable in that such a cloud shaded only one area of the ex-convicts' lives: namely employment on the Waterfront. Megan's Law, on the other hand, arguably constitutes an eclipse affecting every aspect of registrants' lives. As such, the normal deference given to legislative intent (in this case, the regulation of policing and the protection of society) must, in the instant matter, be diluted; the Court must look beyond the intent of Megan's Law and consider its effect to determine its punitive nature, if any. See Collins v. Youngblood, 497 U.S. at 46, 110 S.Ct. at 2721.

### The Dangers Posed by Megan's Law

Plaintiff and his stand-by counsel suggest that Megan's Law potentially imposes upon him a lifelong badge of infamy, rendering him a pariah in his community. Such an allegation cannot be taken lightly. In order to appreciate the effect Megan's Law will or may have on plaintiff, it is beneficial to consider how such badges of shame and their attendant consequences have occurred and been portrayed in a historical context. In this endeavor, reference to some of our sociological/literary heritage is appropriate:

Inside the house lived a malevolent phantom. People said he existed, but Jem and I had never seen him. People said he went out when the moon was down and peeped in windows. When people's azaleas froze in a cold snap, it was because he had breathed on them. Any stealthy small crimes committed in Maycomb were his work. Once the town was terrorized by a series of morbid, nocturnal events: people's chickens and household pets were found mutilated; although the culprit was Crazy Addie, who eventually drowned himself in Barker's Eddy, people still looked at the Radley Place, unwilling to discard their initial suspicions. A Negro would not pass the Radley Place at night, he would cut across the sidewalk opposite and whistle as he walked. The Maycomb school grounds adjoined the back of the Radley lot; from the Radley chicken yard, tall pecan trees shook their fruit into the schoolyard, but the nuts lay untouched by the children: Radley pecans would kill you. A baseball hit into the Radley yard was a lost ball and no questions asked.

Harper Lee, To Kill a Mockingbird, 8–9 (Warner Books Ed., 1987).

This description of a community's perception of a troubled young resident, Arthur "Boo" Radley, illustrates the potential for hysteria inherent in any castigation by a community of one of its members. While Harper Lee's novel gives the perspective of

---

13. "The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession." 363 U.S. at 116, 80 S.Ct. at 1024 (citations omitted).

an imaginative child coming to terms with the community belief as to Boo Radley's malevolence, an earlier novel by Nathaniel Hawthorne depicted a sophisticated and concerted social castigation of a member of its community who had defied its moral code:

> But the point which drew all eyes, and, as it were transfigured the wearer,—so that both men and women who had been familiarly acquainted with Hester Prynne, were not impressed as if they beheld her for the first time,—was that Scarlet Letter, so fantastically embroidered and illuminated [ ] upon her bosom. It had the effect of a spell, taking her out of the ordinary relations with humanity, and enclosing her in a sphere by herself.

Nathaniel Hawthorne, *The Scarlet Letter*, 51 (Bantam Classic Ed.1986).

Hawthorne's *The Scarlet Letter* described the community punishment—by humiliation—meted out to an adulteress: she was forced to wear a scarlet "A" on her chest to show the world her guilt. *See* John A. Brilliant, *The Modern Day Scarlet Letter, A Critical Analysis of Modern Probation Conditions*, 1989 Duke L.J. 1357, 1357 (1989). Brilliant's historical survey observed that such forms of humiliation as punishment were not unusual in so-called civilized societies:

> Late oriental and classical societies engaged in branding as a means of punishing common criminals. The Romans, French and English developed and used branding as a means of identifying criminals by the crime that they had committed. [ ]. Branding, a method widely used in the 17th century, consisted of burning a single letter representing the first letter of the crime committed onto the perpetrator's face. [ ]. "M" would be branded on a murderer, a "T" branded on a thief. This cruel method of marking would preclude those who were branded from finding employment and thus "render[ing] them desperate". [ ]. The American Colonies also generally used branding; New Jersey, for example, punished burglars by branding

the criminal's hand for a first offense and her forehead for subsequent offenses. [ ].

*Id.* at 1361 (citations omitted).

Brilliant went on to discuss the use of flogging and pillories as devices of punishment through humiliation. An analysis of modern equivalents in the context of probation led Brilliant to conclude that some such modern conditions constitute punishment. Modern methods of "branding" listed by Brilliant include a purse snatcher who was required to wear tap shoes; a drunk driver who was forced to make a public apology; a drunk driver who was forced to announce his conviction on a bumper sticker attached to his car; and a child molester who was required to post warnings to the public in bold letters on his car and on his residence. *Id.* at 1362–68 (citations omitted).

The Court is also aware of the fact that societies have often used branding or close equivalents thereto as means of making certain persons or groups of persons easily identifiable and thus, easily ostracized or set apart. These devices range in variety from the crude to the sophisticated. A clear example of such branding, justified by a social purpose wrongfully deemed acceptable by the populace, was the requirement in Nazi Germany that Jews wear the Star of David on their sleeve so that they might be easily identified. Another, less obvious though none the less effective, means of classifying members of society exists in the form of the Indian caste system.

Plaintiff's challenge raises the specter that the law presently under review is a sophisticated and veiled attempt to brand registrants in the eyes of a hostile populace. This Court must, therefore, determine whether Megan's Law and its attendant notification provisions amount to a branding of registrants with a 'Mark of Cain' or a 'Scarlet Letter,' thus rendering them subject to perpetual public animus. In analyzing Megan's Law, the Court must consider whether the notification provisions inherent therein constitute a branding of registrants such that they will be exposed to public humiliation rising to the level of punishment.

### *Level I—Registration*

■ The Court is satisfied that the registration provision does not offend the *ex post facto* or any other constitutional doctrine principally for the reasons expressed in *Arizona v. Noble, supra.* Therefore, this Court finds the registration requirement constitutional.

### *Level II—Notification*

■ In deciding whether the effect of the notification provision of Megan's Law constitutes punishment[14] in the context of the *ex post facto* clause, the Court shall apply the factors set forth in *Kennedy v. Mendoza–Martinez,* 372 U.S. at 168–69, 83 S.Ct. at 567–68 (*See* discussion, *supra* ).

**(1) Does the public dissemination of a registrant's information involve an affirmative disability or restraint?**

14. A brief consideration of the concept which is "punishment" and its underlying philosophy is appropriate:

> In punishing wrongdoers, no one concentrates on the fact that a man has done wrong in the past, or punishes him on that account, unless taking blind vengeance like a beast. No, punishment is not inflicted by a rational man for the sake of the crime that has been committed—after all, one cannot undo what is past— but for the sake of the future, to prevent either the same man or, by the spectacle of his punishment, someone else, from doing wrong again. But to hold such a view amounts to holding that virtue can be instilled by education; at all events the punishment is inflicted as a deterrent.

Plato, *The Collected Dialogues*, 321 (Edith Hamilton and Huntington Cairns, eds., Lane Cooper Trans., Princeton University Press, 1963).

> The two main philosophical justifications for punishment are deterrence and retribution. *See* Greenawalt, *Punishment*, Encyclopedia of Crime and Justice, 1336, 1340–41 (S.H. Kadish ed., 1983). Jeremy Bentham theorized that since the general object in any society is to facilitate the total happiness of·the community, all mischief which detracts from that happiness ought to be excluded. S. Kadish and S. Schulhofer, *Criminal Law and its Precesses*, 139 (5th ed. 1989) (citations omitted). While conceding that punishment as a means of deterring mischief is itself mischief, Bentham believed that the utility of punishment outweighs its evil attributes. *Id.*

This belief that punishment constitutes a deterrent against mischief has a long history, and a current influence, on the use of punishment in society. However, despite its continued practice throughout the ages, the continued prevalence in modern societies of criminal and mischievous activity casts doubt upon the efficacy of punish-

Plaintiff contends that Megan's Law leaves him subject to continuous ongoing police scrutiny and subjects him to suspicion any time a sex offense occurs in his community.

There is no doubt that, in light of one's criminal record, police might suspect one of the commission of a crime to which the police know one has a proclivity. As such, it is not Megan's Law which leaves registered sex offenders subject to periodic investigation or suspicion, but it·is the sex offender's own record which invites such a reaction. That record, by virtue of the public access to judicial proceedings, is already a public one to which the police no doubt had access long before Megan's Law was ever conceived. But the Court's analysis of this factor cannot stop there.

The public dissemination of a registrant's information may well affect his employability,

ment as a deterrent. Wertheimer, *Criminal Justice and Public Policy: Statistical Lives and Prisoners' Dilemmas*, 33 Rutgers L.Rev. 730, 736 (1981). *See Generally*, Sherri A. Carver, *Retribution—A Justification for the Execution of Mentally Retarded and Juvenile Murderers*, 16 Okla. City. U.L.Rev. 155 (1991) (treating of the efficacy of punishment as a deterrent to crime).

The retribution theory justifying punishment is premised on the belief that the wrongdoer should get his just deserts, and that the public should be purged of the wrong he committed. It has long been believed that where retributive punishment is imposed, it ought to equate in degree to the severity of the wrong committed. *See generally Contemporary Punishment: Views, Explanations, and Justifications*, 39 (R. Gerber & P. McAnally eds. 1972).

In view of plaintiff and his stand-by counsel's assertion that Megan's Law will forever brand plaintiff and other registrants as pariahs in the public mind, the Court acknowledges that public humiliation and shame have often served as elements—if not vehicles—of punishment in many societies. Public executions, public floggings, pillories, the severing of a limb or body part, and other means of drawing the public's attention to a deviant have sufficient historical and current (in other countries) notoriety that the Court need not give them specific references here. *See generally Ex parte Wilson*, 114 U.S. 417, 428, 5 S.Ct. 935, 940, 29 L.Ed. 89 (1885) (canvassing "punishments that consist principally in their ignominy").

In evaluating the effect of the *ex post facto* clause on Megan's Law, the Court shall consider both the deterrent and retributive aspects of punishment.

his business associations if he is self-employed (as is plaintiff), his associations with his neighbors, and thus his ability to return to a normal private law-abiding life in the community. Even in light of the previous public access to an individual's conviction record, the Court is troubled by any argument that such impediments do not rise to the level of affirmative disabilities or restraints.

It has long been a facet of United States law that criminal records should be available to the public for scrutiny and investigation. Such criminal records normally would include an individual's name, address, the nature of his crime and conviction and the period for which he was imprisoned therefor. However, Megan's Law goes beyond that. The registration and public notification provisions of Megan's Law provide public dissemination—not mere access by vigilant members of the public—of a convicted sex offender's name, likeness, place of residence, place of employment, a description and identification of his motor vehicle, as well as that information already available in the public record. Therefore, Megan's Law goes well beyond all previous provisions for public access to an individual's criminal history. Indeed, unlike previous access provisions, registration and public notification ensure that, rather than lying potentially dormant in a courthouse record room, a sex offender's former mischief—whether habitual or once-off—shall remain with him for life, as long as he remains a resident of New Jersey. This information, under Megan's Law, is available not just to those who take the time and effort to search out courthouse records, telephone books, or other sources of public information, but to each and every member of a registrant's community, whether they are interested or not. In this Court's view, especially in light of the concern expressed by the Supreme Court in *Reporters Committee, supra*, such an eclipse of a registrant's future weighs heavily in favor of finding it to be an affirmative disability or restraint. The Court so finds.

**(2) Has the public dissemination of an individual's malfeasance, even after he has paid his debt to society, been historically regarded as punishment?**

In the traditional Judeo–Christian story of Creation, an early example of a crude yet effective public notification of one man's crime may be found. The 'Mark of Cain,' a term derived from the Book of Genesis,[15] continues to this day to be a term which strikes fear into the hearts of all but the most reclusive members of any community.

As previously referenced, the social stigma attached to any form of branding, whether for criminal offense, moral indiscretion, religious belief, or the mere fact of being different, has historically been a lifelong albatross around the necks of those so branded. However, in generation after generation, the majority in society has found ample justification for continuing such practices.

Some of those courts which have found registration acts not to be punitive have recognized that "registration has traditionally been viewed as punitive." *Noble*, 829 P.2d at 1222. *See also Austin, supra,* and *Kurth, supra* (recognizing the importance of "historical" analysis in determining whether legislation is punitive). Likewise, in view of the particular public approbation historically associated with sex offenses and the contemporary almost uniform view that such offenses are loathsome, the Court must find that at least the public dissemination element of Megan's Law would, in its application, be a measure historically perceived as punitive.

**(3) Does Megan's Law affect individuals only after a finding of scienter?**

The term 'scienter' has traditionally been interpreted as meaning intent or a criminal *mens rea. See generally* Black's Law Dictionary 1345 (6th ed. 1990). In its application, Megan's Law affects only those who have been convicted of sex offenses or other specifically categorized offenses under the criminal law. Each of these offenses in itself requires that scienter or some equivalent thereof be proven before a conviction may be obtained. As such, in terms of those whom they affect, the registration requirements of Megan's Law are triggered only after scienter has been proven. However, the scienter

---

**15.** *Genesis* 4:15.

associated with an act previously committed by sex offenders and others affected by Megan's Law, at least in the context of its retroactive application, *had* previously existed to the satisfaction of the criminal law.

For the ex-convict affected by the registration requirement of the law whose acts have long antedated October 31, 1994, it is quite possible that scienter has long since disappeared from his consciousness. Indeed, unless the Court is to find that a criminal may never rehabilitate himself or herself, a finding of continuing scienter against all who have ever committed sexual offenses would seem rather onerous, if not downright naive.

The Legislature and the defenders of Megan's Law rest their justification for the law not on scienter but on multitudinous studies which indicate that there is an uncommonly high rate of recidivism among sexual offenders. While plaintiff challenges the merit of such studies and their findings, it is beyond the instant focus of this Court to determine the relative value of studies which indicate such levels of recidivism. Suffice it to say, there is in fact some disagreement as to the relative rate of recidivism among sex offenders in comparison to the likelihood of recidivism among those who commit other categories of crime.[16]

Despite the Court's reservations as to the justification of assuming recidivistic tendencies among past sexual offenders, this factor of *Kennedy* analysis must, in deference to the findings of the New Jersey Legislature, weigh in favor of the regulatory nature of Megan's Law.

**(4) Does the operation of Megan's Law promote the traditional aims of punishment, namely retribution and deterrence?**

In its brief in support of its motion to dismiss, the Office of the Attorney General of New Jersey has repeatedly conceded that Megan's Law is an effort to facilitate police protection of the community, to increase the vigilance of parents in protecting their children from sex offenders, and to discourage reoffense by sex offenders. Are these purposes associated with any aspect of punishment? Again, there is no definitive answer to that question. However, the Court must deal with the issue in the context in which it is raised.

The very nature and function of Megan's Law, by the State's admission, is to deter reoffense by sex offenders through heightened police and public awareness. Megan's Law contemplates public involvement in the state's police function; the public becomes an agent of law enforcement to the extent that heightened awareness will help prevent crime. It has long been argued in the context of community policing that a "cop on the beat" by his mere visibility helps reduce crime within a community. Megan's Law, in application, would deputize every member of registrant's community and thus achieve the ultimate deterrent against reoffense by the registrant. This stated objective, regardless of how innocuously it has been couched by the Legislature, clearly constitutes a traditional element of punishment: deterrence.

Plaintiff would argue that public notification also constitutes the second recognized element of punishment, namely retribution. While the stigma associated with being perpetually perceived as a sexual deviant or predator might arguably constitute retribution, the Court cannot so find based on the record before it. While being sent to Coventry/boycotted, being ostracized within a community, or being excluded from participation in certain areas of community life may have a drastic effect on an individual, they cannot be labeled as an attempt by the government to extend retribution beyond a convict's period of imprisonment. Such a reaction by the community to an individual because of his erstwhile offense might occur even in the absence of laws such as Megan's Law. The government cannot enjoin or preclude community's response to conduct which that com-

---

**16.** *See, e.g.,* A. Nicholas Groth *et al, Undetected Recidivism among Rapists and Child Molesters,* 28 CRIME & DELINQUENCY 450, 452–54 (1982) ("sex offenders have a recidivism rate comparable to non-sexual crime rates."); Stuart Scheingold, Toska Olson & Jana Pershing, *The Politics of Sexual Psychopathy: Washington State's Sexual Predator Legislation,* 15 U.PUGET SOUND L.REV. 809, 810–12 (1992) (finding that sex offenders are no more likely to recidivate than are other categories of criminals).

munity finds deplorable or its treatment of those who carry out such conduct. The First Amendment protects an individual's or a community's right to freely associate, or otherwise, as that individual or that community sees fit. Therefore, any such deleterious consequence of Megan's Law, while onerous, cannot be exclusively connected with the registration and public notification provisions thereof.

Because Megan's Law is aimed at and satisfies one of the traditional goals of punishment—deterrence—this factor of *Kennedy* analysis must weigh in favor of a finding that it is punitive.

### (5) Is the behavior to which Megan's Law applies already a crime?

There is no doubt that Megan's Law affects those who have been convicted of a sex offense or one of the other categorized offenses listed therein. As such, the registration requirement of Megan's Law clearly relates to the individual's previous criminal activity. But the Court must look more closely at this factor.

The defendants argue that even though the would-be registrant is subject to Megan's Law on the basis of his prior crime, such a fact should not be determinative in the instant case. Defendants cite *DeVeau, supra,* and *Hawker v. New York,* 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898), for the proposition that regulatory measures linked to prior criminal conviction are not, by their nature, necessarily punitive. However, as previously discussed herein, *DeVeau* related to an employment restriction within an area of particular concern to the legislature because of its long history of corruption. Likewise, *Hawker* related to the issue of whether a candidate's prior conviction of a felony constituted conclusive character evidence of that candidate's unfitness to practice medicine. This also has traditionally been viewed as an area of particular if not exclusive legislative concern, and is clearly distinguishable from the instant case.

The behavior to which Megan's Law applies is already a crime. As such, to the extent that this factor must be considered, this Court must consider it indicative of the punitive aspect of Megan's Law.

### (6) Is there an alternative purpose assignable to Megan's Law to which it may be rationally connected?

Although the majority of the previous factors weigh in favor of finding that Megan's Law is punitive, there is indeed an alternative purpose to which it may be connected. That alternative purpose, as stated in its Declaration of Intent by the New Jersey Legislature, is to protect the public by increasing community awareness of the risk involved in having a neighbor with a high proclivity towards sexual offense. However, as discussed in this Court's analysis of the third *Kennedy* factor, that purpose—regardless of how artfully the Legislature has couched it—is inextricably linked to deterrence: a traditional element of punishment. Therefore, the court must further analyze the possible purposes of Megan's Law to determine whether there is indeed a legitimate purpose, apart from deterrence, assignable to the act.

Facilitating the effective operation of a law enforcement authority by maintaining a data base of the criminal records, identities, and present locations of known criminals has long been viewed as a legitimate state and federal objective. That objective has long been accomplished by maintaining records of conviction, by requiring ex-felons to register with authorities,[17] and by providing for limited

---

17. While registration in itself has a history of judicial favor, it must be accompanied by proper notice in order for it to be considered constitutional. *See Lambert v. California,* 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), *rehearing denied,* 355 U.S. 937, 78 S.Ct. 410, 2 L.Ed.2d 419 (1958). In *Lambert,* the Supreme Court found that the prosecution of an exconvict for failure to register with law enforcement upon his arrival in Los Angeles violated the ex-convict's due process rights. *Id.* at 229–30, 78 S.Ct. at 243–44. It was not, however, the registration requirement in itself which met with judicial disfavor, but instead the fact that the ex-convict had not been given notification of the need to register. *Id.* at 228, 78 S.Ct. at 242. Megan's Law, in this Court's opinion, absent specific instances which indicate the contrary, does provide sufficient notification to those whom it affects that registration is required, and additionally allows the would-be registrant with sufficient time within which to comply with its requirements.

dissemination of information concerning a registrant in appropriate circumstances. However, the Court must find that Megan's Law goes beyond such traditional justifiable law enforcement objectives.

As discussed in the analysis of the third *Kennedy* factor, the public notification provisions of Megan's Law include the public dissemination of facts about registrants which otherwise could not be obtained, or would be difficult to obtain, in the absence of the notification prescribed. As such, despite the presence of a legitimate alternative purpose for the Act, its inherent punitive aspect must, at least in the context of public dissemination, weigh in favor of finding Megan's Law punitive.

### (7) Does Megan's Law appear excessive in relation to the alternative purposes assigned to it?

In light of the analysis in factor (6) above, the Court must find that, in relation to the purpose of facilitating effective law enforcement, Megan's Law is an excessive intrusion into the realm of punishment sufficient to lend credence to a finding that its effect, if not its purpose, is punitive.

Based on the foregoing analysis of Megan's Law under the factors set forth by the Supreme Court in *Kennedy*, and the fact that most, if not all, of those factors weigh in favor of finding the law to be punitive, the Court must conclude that the Legislature's stated intent for Megan's Law is outweighed by those factors. This Court is satisfied that the public notification provisions of Megan's Law constitute more a form of punishment than a regulatory scheme and is an unconstitutional violation of the United States Constitution in its retroactive application.

Tier 2, narrowing the degree of notification permitted, does not shield it from *ex post facto* analysis. Despite the manner in which it is categorized, it is public notification and has sufficient punitive effect to render it violative of the *ex post facto* clause of the Constitution in its retroactive application.

### CONCLUSION

For the foregoing reasons, the Court finds:

1. The registration requirement of Megan's Law is constitutional and the availability of the registration information to law enforcement agencies alone does not offend the *ex post facto* clause;

2. The Tier 2 limited public notification provision of Megan's Law is unconstitutional in its retroactive application;

3. The Tier 3 public notification provision of Megan's Law is unconstitutional in its retroactive application.

An appropriate Order accompanies this Opinion.

### ORDER

This matter having come before the Court by way of cross-motions by plaintiff Artway and defendants the Attorney General of New Jersey, *et al;* and the Court having heard oral argument and having considered the submissions of the parties and of *amici curiae;* and for good cause shown as set forth more fully in the accompanying Opinion in the above-captioned matter;

IT IS on this 28th day of February, 1995, hereby

ORDERED and ADJUDGED that Megan's Law, as it provides for the registration of certain sex offenders (under Tier 1) is constitutional in its retroactive application; and it is further

ORDERED and ADJUDGED that the public notification and dissemination provisions (under Tiers 2 and 3) of Megan's Law are unconstitutional in their retroactive application.

### ORDER

This matter having come before the Court on the application of Alexander A. Artway for a preliminary injunction against the enforcement of the registration requirement of Megan's Law, and the Court having determined that the registration requirement is constitutional but that plaintiff should be afforded an opportunity to decide whether to pursue injunctive relief against that law in the Court of Appeals,

IT IS on this 28th day of February, 1995 hereby

ORDERED that the defendants be and hereby are ordered to refrain from enforcing the registration requirement from February 28, 1995 to the close of business on March 3, 1995.